JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
BENJAMIN BIEN-KAHN – 267933
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:       jbornstein@rbgg.com
             egalvan@rbgg.com
             bbien-kahn@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| FABIO PETROLINO; M.P., a minor, through her guardian ad litem, Ana Petrolino; ANDRELINA SILVA; ANGELA PETROLINO; and ALEX PETROLINO, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; EVE ZEFF, ROEL LAPITAN and RAPHROGER GONZAGA, Registered Nurses, San Francisco Department of Public Health; MICHAEL MOHN and RUDY ZAMORA, Sheriff's Deputies, San Francisco Sheriff's Department; HEALTHRIGHT360, a California not-for-profit corporation; LAUREN ERICKSON, Mental Health Provider, HealthRight360; MARY LEFEVRE, Marriage and Family Therapist, HealthRight360; NICK CRISPINO, Associate Social Worker, HealthRight360; DANIEL MITCHELL, Officer, California Highway Patrol; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATION OF CIVIL RIGHTS** <br><br> **JURY TRIAL DEMANDED** |

[2998707-8]

**INTRODUCTION**

1.      This is a case about the unnecessary and preventable death of Alberto Petrolino ("Alberto"), a father, son, and brother.  On July 28, 2015, Alberto committed suicide in a shower stall at the San Francisco County Jails ("County Jail" or "County Jails") by hanging himself with a bedsheet.  Three days earlier, Alberto had been arrested and taken into custody at the County Jail after threatening to commit suicide.  Defendants deliberately ignored obvious warning signs of Alberto's risk factors for suicidality and acute mental health crisis, and failed to take minimally adequate precautions and interventions to provide Alberto with the mental health care he needed and to protect him from self-harm.  Had Defendants provided adequate training and supervision to jail staff and promulgated minimally adequate policies and practices that are standard in their fields, Alberto would have survived his detention at the County Jail.  Had Defendants taken Alberto's known suicide risk into consideration in his housing placement, rather than simply assigning him to a general population unit with inadequate supervision and with easy access to materials that could be used for self-harm, Alberto would have survived his detention at the County Jail.  Had Defendants summoned a doctor or qualified mental health professional to provide Alberto the medical and mental health care that he so obviously required due to his deteriorating mental state and heightened risk of suicide, Alberto would have survived his detention at the County Jail.  Instead, Defendants acted with deliberate indifference to Alberto's health and safety and in violation of their duties under federal and state law, causing Alberto's tragic and needless death.

2.      On July 25, 2015, Alberto was arrested by a California Highway Patrol ("CHP") officer after Alberto's ex-girlfriend called 911 to report that he had threatened to kill himself on the Golden Gate Bridge.  Rather than focus on the reason for the 911 call, the CHP officer looked for and found misdemeanor arrest warrants so that he could take Alberto to the County Jail where he would be warehoused, instead of to a hospital where he would be treated for his mental health crisis.

\\

[2998707-8]

3.     When Alberto arrived at the County Jail, the medical and mental health staff conducting intake and booking declined to send Alberto to San Francisco General Hospital or to have him examined by a qualified doctor or mental health professional, and did not place him in specialized housing for inmates who present a suicide risk.  Had Alberto been even minimally supervised, examined, and treated for his mental breakdown, or placed in housing that allowed for greater staff observation, he would not have harmed himself.  Instead, during his three-day detention, Alberto was never seen, evaluated, or treated by a doctor, nor was he ever placed in housing for inmates who pose a heightened suicide risk.  Defendants deliberately ignored all of the warning signs that Alberto was a danger to himself and that he was arrested near the Golden Gate Bridge shortly after he had threatened to kill himself there.  Alberto's sister called the County Jail several times to warn that she feared Alberto would attempt suicide if he were not hospitalized or put in specialized housing.  Alberto's mother was so concerned for his well-being that she traveled to the County Jail and spoke with a Deputy Sheriff to make sure that jail staff would take care of her son.  Yet nothing was done to aid or assist Alberto during his mental health breakdown.

4.     On July 27, 2015, Albert lost all hope and was never seen or treated by any mental health staff for the rest of his life.  On that date, Alberto went to court and was told that his bail would be set at one-hundred thousand dollars ($100,000.00)—a sum he knew would be impossible for his family to pay.  Alberto immediately became despondent due to the unexpected news that he would remain in jail indefinitely.  Despite concerns raised during the bail hearing by Alberto's lawyer that he should be evaluated by qualified mental health professionals to determine whether Alberto needed psychiatric hospitalization and despite the professional standards for jail mental health care requiring that an inmate's psychiatric state be assessed by a mental health provider after a critical event, such as a court appearance, where that inmate may receive bad news, Alberto was not ever seen or evaluated by mental health staff after he returned to the County Jail from his bail hearing.  \\

[2998707-8]

5.      On the evening of July 28, 2015, County Jail custody staff followed the usual routine for inmate showers in the general population unit where Alberto was housed, allowing Alberto unsupervised access to an enclosed shower stall.  Alberto was found dead at around 7:35 pm after another inmate saw his dangling toes not touching the floor under the shower stall door.  The San Francisco County Medical Examiner concluded that Alberto committed suicide by hanging himself with a piece of cut bedsheet tied to a hinge on the shower stall door.  Alberto was the eighth person to commit suicide in the San Francisco County Jails since 2009.

6.      Alberto did not deserve to die and would have survived his stay at the County Jail (1) if law enforcement officers and jail personnel had taken seriously Alberto's mental health needs and the suicide risk he presented, putting them on notice of Alberto's need for immediate mental health care; (2) if the Sheriff's Deputies and medical and mental health staff at the County Jail had been better trained and had taken seriously the signs and symptoms brought to their attention by Alberto's ex-girlfriend, mother, and sister in the days before his death, and the signs and symptoms observed during and after his July 27, 2015 court appearance; (3) if County Jail staff followed the standard of care in jail mental health to pay special attention to inmates after critical events where they may receive bad news affecting their psychiatric stability; and (4) if there had been appropriate policies, procedures, and training to ensure that inmates in psychiatric distress at the County Jail would be adequately assessed, treated, housed, and supervised.  Instead, Defendants, and each of them, deliberately turned their backs on Alberto's special needs and as a direct result, he died.

7.      Alberto's children, FABIO PETROLINO and M.P., a minor, bring survival actions against Defendants for damages arising out of the violation of Alberto Petrolino's civil rights, as guaranteed by the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, for violations of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973, and for violations of California state law.  Plaintiffs FABIO PETROLINO, M.P., ANDRELINA SILVA,

[2998707-8]

ANGELA PETROLINO, and ALEX PETROLINO also seek damages for violations of their own civil rights by Defendants, as guaranteed by the First and Fourteenth Amendments to the United States Constitution, and for violations of California state law.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for the federal law claims, and has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, as they form part of the same case and controversy arising under federal law.  The amount in controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

9.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district, in the City and County of San Francisco.

## INTRADISTRICT ASSIGNMENT

10.     A substantial part of the events or omissions which give rise to Plaintiffs' claims arose in the City and County of San Francisco and thus, pursuant to Civil Local Rules 3-2(c) and (d), assignment to the San Francisco Division of the District Court for the Northern District of California is proper.

## PARTIES

11.     Plaintiffs' decedent is Alberto Petrolino, who, at the time of his death, was a fifty-year-old citizen of the United States and a resident of the City and County of San Francisco in the State of California.

12.     Plaintiffs FABIO PETROLINO ("FABIO") and M.P. are the children of Alberto Petrolino.  M.P., a minor, is represented in the instant matter by her mother and guardian ad litem, Ana Petrolino.  At the time of his death, Alberto Petrolino had no surviving spouse and no other children.  Accordingly, FABIO and M.P. are Alberto Petrolino's sole heirs and successors in interest, as defined by the laws of the State of California, and are authorized by California Code of Civil Procedure § 377.30 to bring survival causes of action for damages suffered by Alberto Petrolino prior to his death and

[2998707-8]

1  that he would have been entitled to recover had he lived.  FABIO and M.P., through her

2  mother and guardian ad litem, Ana Petrolino, have executed declarations conforming to the

3  requirements of California Code of Civil Procedure § 377.32, filed herewith.  The survival

4  causes of action alleged herein are based on violations of Alberto Petrolino's civil rights as

5  guaranteed by the Fourteenth Amendment, on violations of Title II of the Americans with

6  Disabilities Act and Section 504 of the Rehabilitation Act of 1973, and on violations of

7  California state law.

8         13.     Plaintiffs FABIO and M.P. are also suing, individually, for the wrongful

9  death of their father, Alberto Petrolino, and their resulting loss, and for the violation of

10  their civil rights as guaranteed by the First and Fourteenth Amendments, and for violations

11  of California state law.

12         14.     Plaintiff ANDRELINA SILVA ("ANDRELINA") is the mother of Alberto

13  Petrolino.  She is suing individually for the wrongful death of her son and her resulting

14  loss, and for the violation of her civil rights as guaranteed by the First and Fourteenth

15  Amendments, and for violations of California state law.

16         15.     Plaintiff ANGELA PETROLINO ("ANGELA") is the sister of Alberto

17  Petrolino.  Plaintiff ALEX PETROLINO ("ALEX") is the brother of Alberto Petrolino.

18  They are suing individually for the wrongful death of their brother and their resulting loss,

19  and for the violation of their civil rights as guaranteed by the First and Fourteenth

20  Amendments, and for violations of California state law.

21         16.     Plaintiffs FABIO and M.P. are residents of the City and County of San

22  Francisco in the State of California.  Plaintiffs ANDRELINA, ANGELA, and ALEX are

23  residents of the County of Santa Clara in the State of California.

24         17.     Defendant CITY AND COUNTY OF SAN FRANCISCO ("CITY AND

25  COUNTY") is a municipal corporation, duly organized and existing under the laws of the

26  State of California.  Under its authority, Defendant CITY AND COUNTY operates the

27  San Francisco County Sheriff's Department and the San Francisco County Department of

28  Public Health, and is and was at all times relevant herein responsible for their policies,

1   procedures, customs, and practices, and for the actions and/or inactions of all of its

2   officers, managers, agents, and employees, including Defendants EVE ZEFF, ROEL

3   LAPITAN, RAPHROGER GONZAGA, MICHAEL MOHN, RUDY ZAMORA, and

4   some or all of DOES 1 through 50.

5       18.     The San Francisco County Sheriff's Department ("Sheriff's Department")

6   operates and administers the San Francisco County Jails, including San Francisco County

7   Jail No. 1 ("County Jail No. 1"), the Intake and Release Center where all County Jail

8   inmates are booked into the Sheriff Department's custody, and San Francisco County Jail

9   No. 2 ("County Jail No. 2"), where Alberto Petrolino was housed from July 25, 2015 until

10  his death on July 28, 2015.  The Sheriff's Department also maintains two jail wards at the

11  San Francisco General Hospital ("S.F. General Hospital") for inmates in need of medical

12  or mental health care requiring hospitalization.  The Sheriff's Department is and was

13  responsible for preserving the health and safety of all inmates in the County Jails.

14      19.     The San Francisco County Department of Public Health ("Department of

15  Public Health"), through its Jail Health Services division, is and was responsible for

16  providing emergency and basic medical and mental health care services to all County Jail

17  inmates, including those held in the jail wards maintained by the Sheriff's Department at

18  S.F. General Hospital.  Jail Health Services oversees and supervises Jail Medical Services

19  and its staff, who are employed by Defendant CITY AND COUNTY.  Plaintiffs are

20  informed and believe and thereon allege that Jail Health Services also oversees and

21  supervises Jail Psychiatric Services (also known as Jail Behavioral Health Services), a

22  program of Defendant HEALTHRIGHT360, a not-for-profit corporation that provides

23  mental health care services to all County Jail inmates pursuant to a contract with the

24  Department of Public Health.  The Department of Public Health is and was responsible for

25  the policies, procedures, customs, and practices of Jail Medical Services and Jail

26  Psychiatric Services, and the actions and omissions of their agents and employees,

27  including Defendants EVE ZEFF, ROEL LAPITAN, RAPHROGER GONZAGA,

28  LAUREN ERICKSON, MARY LEFEVRE, NICK CRISPINO, and some or all of DOES 3

1   through 50.  The Department of Public Health also is and was responsible for the provision

2   of mental health care services to people experiencing severe emotional distress or acute

3   problems relating to mental disabilities, as well as acute psychiatric inpatient care for

4   adults in the City and County of San Francisco, including for individuals who, as a result

5   of a mental disorder, are a danger to others or themselves, or are gravely disabled, pursuant

6   to California Welfare and Institutions Code §§ 5150, *et seq*.

7          20.     Defendant HEALTHRIGHT360 is a California not-for-profit corporation,

8   headquartered in the State of California.  At all times relevant herein, Defendant CITY

9   AND COUNTY delegated its authority and responsibility to provide mental health care

10  services for all County Jail inmates to Defendant HEALTHRIGHT360, through its

11  program Jail Psychiatric Services (also known as Jail Behavioral Health Services),

12  pursuant to a contract with Defendant CITY AND COUNTY's Department of Public

13  Health.  Under this authority, Defendant HEALTHRIGHT360 is and was responsible for

14  providing emergency and basic mental health care services to all County Jail inmates, for

15  making and enforcing the policies, procedures, customs, and practices of Jail Psychiatric

16  Services, and for the actions and omissions of its agents and employees, including

17  Defendants LAUREN ERICKSON, MARY LEFEVRE, NICK CRISPINO, and some or

18  all of DOES 3 through 50.  Plaintiffs are informed and believe and thereon allege that

19  Defendant HEALTHRIGHT360 is also responsible for training Defendant CITY AND

20  COUNTY employees with regard to the mental health care needs of inmates in the County

21  Jails, including training on suicide risk assessment and suicide prevention.  Defendant

22  HEALTHRIGHT360 is sued for actions and/or omissions under the color of state law.

23         21.     Defendant DANIEL MITCHELL is and was at all relevant times herein an

24  Officer of the California Highway Patrol.  Defendant MITCHELL arrested Alberto

25  Petrolino at the Golden Gate Bridge on July 25, 2015 and transported him to County Jail

26  No. 1, where he was booked into Defendant CITY AND COUNTY's custody.

27         22.     Defendant EVE ZEFF is and was at all relevant times herein employed by

28  Defendant CITY AND COUNTY as a registered nurse for Jail Medical Services, and was

acting within the course and scope of that employment.  Defendant ZEFF evaluated

Alberto Petrolino upon his arrival at County Jail No. 1 on July 25, 2015, conducting a

medical triage interview to determine whether he would be referred to S.F. General

Hospital for further evaluation and treatment by medical or mental health professionals,

yet she instead decided to accept him into County Jail custody.

23.     Defendant ROEL LAPITAN is and was at all relevant times herein

employed by Defendant CITY AND COUNTY as a registered nurse for Jail Medical

Services, and was acting within the course and scope of that employment.  Defendant

LAPITAN conducted a medical intake screening of Alberto Petrolino after he was

accepted into County Jail custody on July 25, 2015, yet declined to place him in an

Observation Cell for monitoring pending an assessment by Jail Psychiatric Services staff

of the suicide risk he presented.

24.     Defendant LAUREN ERICKSON was at all relevant times herein employed

by Defendant HEALTHRIGHT360 as an unlicensed mental health care provider for Jail

Psychiatric Services, and was acting within the course and scope of that employment.

Defendant ERICKSON conducted a mental health status evaluation of Alberto Petrolino

on July 25, 2015, yet decided that he should be housed in the County Jail's general

population with no suicide prevention precautions other than a "Do Not House Alone"

code on his housing card.

25.     Defendant DOE 1 was at all relevant times herein employed by Defendant

CITY AND COUNTY as a Sheriff's Deputy at the County Jail, and was acting within the

course and scope of that employment.  Defendant DOE 1 spoke with Alberto Petrolino's

mother, Plaintiff ANDRELINA, at the County Jail on July 25, 2015, who warned that her

son had been arrested for threatening to commit suicide.  Defendant DOE 1 told Plaintiff

ANDRELINA that he knew Alberto Petrolino and would take care of him.

26.     Defendant DOE 2 was at all relevant times herein employed by Defendant

CITY AND COUNTY as a Sheriff's Deputy at the County Jail, and was acting within the

course and scope of that employment.  Defendant DOE 2 spoke with Alberto Petrolino's

1  sister, Plaintiff ANGELA, on or about July 26, 2015, who warned that her brother was

2  suicidal and that County Jail staff should take precautions to protect him.

3      27.    Defendant MARY LEFEVRE was at all relevant times herein employed by

4  Defendant HEALTHRIGHT360 as a marriage and family therapist for Jail Psychiatric

5  Services, and was acting within the course and scope of that employment.  Defendant

6  LEFEVRE spoke with Alberto Petrolino's sister, Plaintiff ANGELA, on July 27, 2015,

7  who warned that her brother was suicidal and that County Jail staff should take precautions

8  to protect him.

9      28.    Defendant NICK CRISPINO was at all relevant times herein employed by

10 Defendant HEALTHRIGHT360 as an associate social worker for Jail Psychiatric Services,

11 and was acting within the course and scope of that employment.  Defendant CRISPINO

12 met with Alberto Petrolino on July 27, 2015 shortly before his bail hearing and

13 documented that he was "focused on finding out what will happen in court," yet Defendant

14 CRISPINO decided that Alberto Petrolino should not be provided a follow-up mental

15 health evaluation until July 29, 2015, two days after this critical event.

16     29.    Defendant RAPHROGER GONZAGA is and was at all relevant times herein

17 employed by Defendant CITY AND COUNTY as a registered nurse for Jail Medical

18 Services, and was acting within the course and scope of that employment.  Defendant

19 GONZAGA was the only medical or mental health staff member at the County Jail to

20 observe Alberto Petrolino alive after he returned from court on July 27, 2015, when she

21 discontinued his 48-hour alcohol detoxification protocol.  Defendant GONZAGA failed to

22 assess how that critical event had affected Alberto Petrolino's psychiatric condition or

23 refer him for a mental health assessment by Jail Psychiatric Services.

24     30.    Defendants MICHAEL MOHN and RUDY ZAMORA are and were at all

25 relevant times herein employed by Defendant CITY AND COUNTY as Sheriff's Deputies

26 at the County Jail, and were acting within the course and scope of that employment.

27 Plaintiffs are informed and believe and thereon allege that Defendants MOHN and

28 ZAMORA, along with one or more of DOES 1 through 50, were responsible for

[2998707-8]

1  monitoring the inmates housed in County Jail No. 2's F Pod on the evening of July 28,

2  2015, and failed to prevent Alberto Petrolino from entering a shower stall with a piece of

3  bedsheet and hanging himself from the shower door hinge, where he remained until he was

4  discovered by another inmate.

5       31.     The true names and identities of Defendants DOES 1 through 50 are

6  presently unknown to Plaintiffs.  Plaintiffs allege that each of Defendants DOES 1 through

7  50 was employed by Defendant CITY AND COUNTY, Defendant HEALTHRIGHT360,

8  and/or by the California Highway Patrol at the time of the conduct alleged herein.

9  Plaintiffs allege that each of Defendants DOES 1 through 50 was deliberately indifferent to

10  Alberto Petrolino's medical needs and safety, failed to provide necessary medical and

11  mental health care to him and to take other measures to prevent him from attempting

12  suicide in the San Francisco County Jails, violated his civil rights, wrongfully caused his

13  death, and/or encouraged, directed, enabled, and/or ordered other defendants to engage in

14  such conduct.  Plaintiffs further allege that some of Defendant DOES 1 through 50 were

15  responsible for hiring, screening, training, retention, supervision, discipline, counseling, or

16  control of medical, mental health, custody, and/or law enforcement employees and/or

17  agents involved in the conduct alleged herein.  Plaintiffs allege that as a direct and

18  proximate result of the conduct of Defendants DOES 1 through 50, including the failure to

19  provide necessary medical and mental health care and to take other measures to protect

20  Alberto Petrolino from committing suicide, and/or the failure to train, supervise, and/or

21  promulgate minimally adequate policies, procedures, customs, and practices at the San

22  Francisco County Jails to protect the health and safety of Alberto Petrolino and other

23  similarly-situated inmates, Plaintiffs suffered the injuries and damages alleged herein.

24  Plaintiffs will seek to amend this Complaint to state the names and capacities of

25  Defendants DOES 1 through 50 as soon as they have been ascertained.

26       32.     Defendants EVE ZEFF, ROEL LAPITAN, RAPHROGER GONZAGA,

27  LAUREN ERICKSON, MARY LEFEVRE, NICK CRISPINO, MICHAEL MOHN,

28  RUDY ZAMORA, DANIEL MITCHELL, and DOES 1 through 50, and each of them, to

[2998707-8]

the extent that they engaged in any actions or omissions alleged herein, did so under color of state law, and in the course and scope of their employment with Defendant CITY AND COUNTY and/or Defendant HEALTHRIGHT360 and/or CHP.

33.     Plaintiffs are informed and believe and thereon allege that at all relevant times herein, Defendants, and each of them, were the agents, employees, servants, joint venturers, partners and/or co-conspirators of each of the other Defendants, and that at all times each of the Defendants was acting within the course and scope of said relationship with each other Defendant.

**EXHAUSTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS**

34.     On January 19, 2016, Plaintiffs filed tort claims pursuant to California Government Code §§ 910 *et seq.*, including survival claims on behalf of decedent Alberto Petrolino, with California's Victim Compensation and Government Claims Board (the "Claims Board") against Defendant MITCHELL and each of DOES 1 through 50 (if any) who were employed by the California Highway Patrol.  By correspondence dated March 25, 2016, the Claims Board notified Plaintiffs that it had rejected their tort claims at its meeting on March 17, 2016.  On January 20, 2016, Plaintiffs filed tort claims pursuant to California Government Code §§ 910 *et seq.*, including survival claims on behalf of decedent Alberto Petrolino, against Defendant CITY AND COUNTY and all individual Defendants who are or were employed thereby.  By correspondence dated February 10, 2016, Defendant CITY AND COUNTY rejected Plaintiffs' tort claims.

35.     By correspondence dated February 1, 2016, Plaintiffs notified Defendants CITY AND COUNTY, ZEFF, LAPITAN, ERICKSON, LEFEVRE, CRISPINO, and GONZAGA of Plaintiffs' intent to file suit against them based on their negligence in providing professional health care services, as required by California Code of Civil Procedure § 364.

**FACTUAL ALLEGATIONS**

36.     Alberto Petrolino ("Alberto") was born in Brazil on February 10, 1965.  As a child, Alberto immigrated to the United States with his family, including his mother

[2998707-8]

1   ANDRELINA, his sister ANGELA, and his brother ALEX.  Alberto's family lived for

2   several years in Pittsburgh, Pennsylvania before settling in Fremont, California.  After

3   graduating high school, Alberto attended Chabot College in Hayward, California, where he

4   met his future wife.  Alberto was married to Ana Petrolino ("Ana") for 14 years before

5   they divorced in 2004.  Ana and Alberto had a son and daughter together, FABIO and M.P.

6   After they married, Ana and Alberto moved to San Francisco, California, where Alberto

7   worked as a chef in high-end restaurants.  In 1998, Alberto opened his own restaurant,

8   Terra Brazilis, in the Hayes Valley neighborhood of San Francisco.  Owning a restaurant

9   created a lot of stress for Alberto, and he began to struggle with alcoholism, contributing to

10  the failure of his business and the end of his marriage.

11        37.     Over the years, Alberto was sometimes able to stop drinking for months or

12  years at a time, including successfully completing a two-year rehabilitation program at the

13  Delancey Street Foundation's residential treatment facility in San Francisco, but he was

14  still struggling with alcohol dependency at the time of his death.  Over the last several

15  years of his life, including for much of 2015, Alberto lived with his mother ANDRELINA

16  and his brother ALEX, and maintained a very close relationship with his sister ANGELA.

17  Alberto continued to work in the restaurant industry, including as a chef.  FABIO and M.P.

18  loved their father and had looked forward to developing a closer relationship with him

19  once Alberto turned his life around.  At the time of Alberto's death, FABIO was 21 and

20  M.P. was 15.

21        38.     Defendants CITY AND COUNTY and HEALTHRIGHT360 and their

22  agents and employees—including law enforcement officers, County Jail staff, and medical

23  and mental health professionals—had extensive contacts with Alberto in the last years of

24  his life, putting them on notice of his alcohol dependency and mental health care needs.

25        39.     In or around October 2009, Alberto dropped out of a twelve-month

26  residential rehabilitation program at the Jericho Project in Daly City, California, relapsing

27  when he was about two weeks away from attaining one year of sobriety.  Shortly

28  thereafter, on or about October 14, 2009, Alberto was taken into custody by the San

1  Francisco Police Department after his girlfriend called 911 to report that Alberto had left
2  her a voicemail threatening to commit suicide by jumping off of the Golden Gate Bridge.
3  Because the 911 call indicated that Alberto posed a danger to himself, he was brought to
4  S.F. General Hospital, pursuant to California Welfare and Institutions Code § 5150, for
5  psychiatric evaluation and treatment.  Defendant CITY AND COUNTY's records
6  document that Alberto's girlfriend told the police that Alberto "has had a history of
7  suicidal thoughts," that Alberto previously "stole a knife and wanted to cut his wrist," and
8  that Alberto "is often suicidal when drinking."

9       40.    On or around December 29, 2009, Alberto was booked into custody at the
10 County Jail.  Defendant CITY AND COUNTY's records document that Alberto reported
11 to a Jail Health Services nurse at intake that he was currently feeling depressed and that
12 when he was depressed in the past, he had thought about committing suicide.  Alberto also
13 reported that he had suffered major losses heightening his suicide risk, including that he
14 had recently dropped out of an alcohol rehabilitation program, that his girlfriend had
15 broken up with him, and that he had lost his job, his car, his home, his phone, and his
16 belongings.  The following day, on December 30, 2009, a Jail Psychiatric Services mental
17 health provider met with Alberto at the County Jail for a mental health status evaluation.
18 According to Defendant CITY AND COUNTY's records, Alberto was "on the verge of
19 tears" during the evaluation and was "upset about his life choices," and reported that
20 "when he is on a drinking binge he will often have hopeless thoughts like he'd be 'better
21 off dead'."

22      41.    In the last year of his life, Alberto was arrested and booked into custody at
23 least four times at the San Francisco County Jails after he had been drinking alcohol in
24 excess, before his final arrest on July 25, 2015.  In each instance, Defendant CITY AND
25 COUNTY's agents and employees—including Defendants ZEFF, LAPITAN, and
26 GONZAGA—identified that Alberto was intoxicated and initiated alcohol detoxification
27 protocols.  For instance, on July 11, 2015, Alberto was arrested and booked into Defendant
28 CITY AND COUNTY's custody at County Jail No. 1.  During intake, Alberto was

[2998707-8]

interviewed by Defendant LAPITAN, a Jail Health Services nurse, who determined that Alberto was intoxicated and that he was at a medium risk of suffering from alcohol withdrawal, and placed on him on an alcohol detoxification protocol.  Alberto was assigned to a general population housing pod in County Jail No. 2, where he remained until he was ordered to attend an alcohol treatment program and released by the Court on July 21, 2015.  However, Alberto failed to appear at the program and, as a result, on July 24, 2015, two bench warrants were issued for his arrest.

42.    On July 25, 2015, Alberto called his ex-girlfriend Debra from a payphone near the Golden Gate Bridge and left a voicemail threatening to kill himself if they could not be together.  Concerned that Alberto would act on his threat, Debra called 911 and reported that Alberto had threatened to commit suicide and that she feared that he was going to jump off of the Golden Gate Bridge.  The California Highway Patrol ("CHP") responded to Debra's 911 call.  Golden Gate Bridge Patrol Officer C. Robles found Alberto asleep and intoxicated on a bench at the Golden Gate Bridge's East Lot and Defendant MITCHELL, a CHP Officer, arrived at the scene shortly thereafter.  Defendant MITCHELL observed that Alberto was intoxicated, and smelled alcohol on his breath and person.  Defendant MITCHELL called Debra, who Plaintiffs are informed and believe and thereon allege repeated to him that she feared that Alberto would act on his threat to kill himself.  Defendant MITCHELL then called Alberto's sister, ANGELA, and left her a voicemail reporting that Alberto had been detained at the Golden Gate Bridge after threatening to kill himself.  ANGELA promptly returned the call, informed Defendant MITCHELL that Alberto had attempted suicide in the past, and requested that Alberto be brought to a hospital because ANGELA believed that he posed a danger to himself.

43.    Although Defendant MITCHELL knew that Alberto had recently threatened to commit suicide by jumping off of the Golden Gate Bridge and had just been found intoxicated there, and although he had received warnings from Alberto's ex-girlfriend and sister that they feared that Alberto would follow through on his threat to kill himself, Defendant MITCHELL did not bring Alberto to a hospital for psychiatric evaluation and

[2998707-8]

1   treatment, pursuant to California Welfare and Institutions Code § 5150.  Defendant

2   MITCHELL instead placed Alberto under arrest on the two misdemeanor bench warrants

3   issued by the Court on July 24, 2015, including for failure to appear at the alcohol

4   treatment program as ordered on July 21, 2015, and brought Alberto to County Jail No. 1.

5         44.     When Defendant MITCHELL brought Alberto to County Jail No. 1 for

6   booking, Defendant ZEFF, a Jail Health Services Registered Nurse, was conducting the

7   medical triage to determine whether arriving arrestees' medical or mental health problems

8   necessitated being sent to S.F. General Hospital for evaluation by medical and/or mental

9   health professionals before being accepted into custody by the County Jail.  On July 25,

10  2015 at or around 4:06 pm, Defendant ZEFF conducted a medical triage of Alberto.

11  Defendant MITCHELL told Defendant ZEFF the circumstances of Alberto's arrest,

12  including that he had been found intoxicated at the Golden Gate Bridge after telling his ex-

13  girlfriend that he was going to kill himself there.

14        45.     Despite Defendant ZEFF's knowledge that Alberto presented a high risk of

15  suicide due to his intoxicated state at the time of his arrest, his known history of alcohol

16  dependence, and his very recent threat of suicide and possible aborted suicide attempt at

17  the Golden Gate Bridge, Defendant ZEFF accepted Alberto into custody at the County Jail

18  rather than sending him to S.F. General Hospital.  Moreover, although the written policies

19  of Defendants CITY AND COUNTY and HEALTHRIGHT360 authorize any custody or

20  medical personnel at the County Jails to "initiate safety cell placement upon receiving

21  information that alerts them to potential suicide risk" and require that "[u]pon recognition

22  that an inmate is at risk for suicide, the inmate is placed in a safety cell for monitoring until

23  the inmate can be further assessed by a mental health professional," Defendant ZEFF did

24  not place Alberto in any type of special cell for protection of persons at risk of suicide.

25        46.     On July 25, 2015 at or around 5:15 pm, Defendant LAPITAN, a Jail Health

26  Services Registered Nurse, conducted a medical intake screening of Alberto.  Plaintiffs are

27  informed and believe and thereon allege that Defendant LAPITAN reviewed Defendant

28  CITY AND COUNTY's records of the triage interview conducted by Defendant ZEFF

when Alberto was accepted into custody at County Jail No. 1, and was thus aware that Alberto had been arrested at the Golden Gate Bridge after threatening to kill himself. Defendant LAPITAN documented that Alberto was intoxicated and placed him on an alcohol detoxification protocol, just as she did two weeks earlier after his July 11, 2015 arrest. Despite Defendant LAPITAN's knowledge that Alberto presented a high risk of suicide due to his intoxicated state at the time of his arrest, his known history of alcohol dependence, and his very recent threat of suicide and possible aborted suicide attempt at the Golden Gate Bridge, and in violation of the written policies of Defendants CITY AND COUNTY and HEALTHRIGHT360, Defendant LAPITAN did not place Alberto in any type of special cell for monitoring pending a mental health assessment upon receiving information alerting her that he was at risk for suicide.

47.     On July 25, 2015 at or around 7:13 pm, Defendant ERICKSON, an unlicensed Jail Psychiatric Services mental health provider employed by Defendant HEALTHRIGHT360, conducted a mental health status evaluation of Alberto. Defendant ERICKSON was aware that Alberto had been arrested at the Golden Gate Bridge after he had threatened to kill himself there, and that he was on an alcohol detoxification protocol. According to Defendant CITY AND COUNTY's records, Defendant ERICKSON reviewed Alberto's medical records, including those documenting that Alberto had previously been evaluated as a potential suicide risk at the County Jail and that he had previously been taken into custody for psychiatric evaluation and treatment, pursuant to California Welfare and Institutions Code § 5150, after telling his girlfriend that he was going to commit suicide by jumping off of the Golden Gate Bridge. Although Defendant ERICKSON documented "Problem Behavior" of Alberto, demonstrating that she knew that he posed a high risk of suicide—including "daily alcohol consumption; history of PES [S.F. General Hospital's Psychiatric Emergency Services] contact for reported suicidal ideation; detoxing from alcohol; on JMS [Jail Medical Services] alcohol detox protocol; relatively unknown to BHS [Jail Behavioral Health Services]; irritable mood; [and] minimally participative in BHS inter[v]iew"—Defendant ERICKSON decided that Alberto

[2998707-8]

should be housed in the general population at the County Jails, with no suicide prevention precautions other than putting a "Do Not House Alone" code on his housing card, a widely discredited response to suicidality that simply relies on the existence of a cellmate to protect against self-harm by the person at risk of suicide.

48.    Plaintiffs are informed and believe and thereon allege that custody, medical and mental health staff at the San Francisco County Jails, including Defendants ZEFF, LAPITAN, ERICKSON, and some of Defendant DOES 1 through 50, recklessly ignored the obvious and known heightened risk of suicide presented by Alberto, and failed to summon medical care or take any other action so that Alberto would receive mental health treatment or to otherwise reduce his risk and opportunity to commit suicide at the County Jails.  These Defendants failed to place Alberto in an Observation Cell, where he would have been under "intensive observation," including direct observation safety checks twice every 30 minutes and at least daily evaluation by mental health professionals, and without access to materials that could be used for self-harm.  These Defendants also failed to house Alberto in the Observation Area Housing in Pod C of County Jail No. 2, which was and is used by Defendant CITY AND COUNTY to house inmates who are not considered actively suicidal but have expressed suicidal ideation and/or have a recent prior history of suicidal behavior.  Plaintiffs are informed and believe and thereon allege that in the Observation Area Housing, Alberto would have been housed in a cell with a glass door permitting ongoing direct observation by custody and medical staff, with daily evaluations by mental health professionals, and without access to materials that could be used for self-harm, such as bedsheets.  Instead, Defendants assigned Alberto to County Jail No. 2's Intake and Classification Pod, also known as F Pod, which is intended to house general population inmates who are not at risk of suicide.

49.    San Francisco County Jail custody and medical personnel, including some of Defendants DOES 1 through 50, received additional warnings of the suicide risk presented by Alberto after he was booked into Defendant CITY AND COUNTY's custody.  Within hours of Alberto's arrival at County Jail No. 1, his mother ANDRELINA went to the

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

[2998707-8]

1  County Jail to warn the jailers, including some of Defendants DOES 1 through 50, that

2  Alberto had been arrested after threatening to commit suicide.  ANDRELINA was not

3  permitted to see Alberto but spoke with a Sheriff's Deputy, Defendant DOE 1, who told

4  ANDRELINA that he usually worked night shifts at the County Jail, that he knew Alberto,

5  and that he would take care of her son.  Additionally, Alberto's sister ANGELA called the

6  County Jail on July 25, 2015 and on each of the following two days to warn that Alberto

7  was suicidal.  On or about July 26, 2015, ANGELA called the County Jail and spoke with

8  a Sheriff's Deputy, Defendant DOE 2, expressed her concern for Alberto's safety, and

9  asked whether he was on suicide watch or in specialized housing for people who pose a

10 danger to themselves, but Defendant DOE 2 simply responded that Alberto had been

11 assigned to general population because he had been arrested on an outstanding warrant.

12        50.    On the morning of July 27, 2015, ANGELA called the County Jail and spoke

13 with Defendant LEFEVRE, a Jail Psychiatric Services family and marriage therapist

14 employed by Defendant HEALTHRIGHT360, and again warned that Alberto was suicidal

15 and that precautions should be taken to protect him from self-harm.  Defendant LEFEVRE

16 relayed ANGELA's warning to personnel at County Jail No. 2, including some of

17 Defendant DOES 1 through 50, but told ANGELA that Alberto "appeared fin[e] so he was

18 put in a regular pod with everybody."

19        51.    Defendant CRISPINO, a Jail Psychiatric Services social worker employed by

20 Defendant HEALTHRIGHT360, met with Alberto later that morning of July 27, 2015,

21 about an hour after ANGELA's warning to Defendant LEFEVRE.  Defendant CRISPINO

22 documented that Alberto was "[f]uture-focused on finding out what will happen in court"

23 at his bail hearing later that day, and that Alberto was hopeful that he would be released by

24 the judge and ordered into an alcohol treatment program.

25        52.    It is the standard of care in jail mental health to pay special attention to

26 inmates after a critical event such as a court appearance where that inmate may receive bad

27 news.  Defendant CITY AND COUNTY's own written policies recognize that "[c]ertain

28 times during confinement represent more serious threats of suicide, including … after the

court disposition ….."  Although Defendant CRISPINO knew that Alberto was going to court for a bail hearing shortly after they spoke on July 27, 2015, he took no action to ensure that Alberto would be assessed by a mental health professional soon after his upcoming court appearance.  Instead, in reckless disregard of the danger to Alberto, Defendant CRISPINO recommended that Alberto's already-scheduled follow-up mental health assessment go ahead as planned on July 29, 2015, two days after the bail hearing.

53.     During Alberto's bail hearing on July 27, 2015, the judge set his bail at an impossibly high one-hundred thousand dollars ($100,000.00).  Alberto realized that his family would be unable to afford his bail and that he would not be released from jail as he had anticipated.  Alberto's mother, ANDRELINA, was in court when bail was set and could see that Alberto appeared to be devastated; his demeanor immediately changed and ANDRELINA saw the shock and hopelessness on her son's face.  Plaintiffs are informed and believe and thereon allege that, although Alberto's public defender was not told of the circumstances surrounding his arrest, including that Alberto had threatened to commit suicide only two days before the bail hearing, the public defender observed that he was crying and appeared very distraught, and was so worried for his health and safety that she requested that the judge order that Alberto be taken to S.F. General Hospital for psychiatric evaluation and treatment, pursuant to California Penal Code § 4011.6.  Despite this request, Alberto was returned to the general population housing pod at County Jail No. 2 and was never again seen or evaluated by County Jail mental health staff.

54.     After Alberto returned from court on July 27, 2015 with the unexpected and devastating news that he would remain at the County Jail indefinitely, County Jail mental health staff, including Defendants CRISPINO, LEFEVRE, ERICKSON, and some of DOES 3 through 50, did nothing to follow up with Alberto or assess how the unexpected news had affected his psychiatric condition.  The only medical staff to see Alberto alive after his return from court was Defendant GONZAGA, a Jail Health Services Registered Nurse who saw Alberto to fill out a form regarding his alcohol detoxification protocol.  On the form Defendant GONZAGA discontinued any further detoxification checks by medical

1   staff on the ground that the standard 48-hour period for detoxification checks had expired.

2   Defendant GONZAGA discontinued detoxification checks at 5:40 pm on July 27, 2015;

3   Defendant CITY AND COUNTY's records indicate that no medical or mental health staff

4   saw Alberto until he was found unresponsive in the shower stall about 26 hours later.

5   Persons who saw Alberto in court that morning observed that he was still exhibiting

6   symptoms of alcohol detoxification.  Defendant GONZAGA discontinued the checks

7   through rote application of the 48-hour protocol.  Had Defendant GONZAGA not

8   discontinued the checks, medical staff would have made further checks on Alberto that

9   would have interrupted his fatal decline.

10       55.     Plaintiffs are informed and believe and thereon allege that after his return

11   from court on July 27, 2015, Alberto's psychiatric condition began to visibly deteriorate,

12   and that his appearance and behavior put Defendant GONZAGA and any and all custody

13   personnel who observed or interacted with him, including Defendants MOHN and

14   ZAMORA and some of Defendant DOES 1 through 50, on notice that Alberto was at risk

15   of suicide, that his psychiatric situation was dire, and that he required immediate medical

16   and/or mental health care intervention.  Plaintiffs are informed and believe and thereon

17   allege that, in reckless disregard of this known and/or obvious risk, no Defendant who

18   observed or interacted with Alberto in County Jail No. 2 after he returned from his bail

19   hearing on July 27, 2015 summoned medical care or took any other action to provide

20   Alberto with mental health treatment or to otherwise reduce the risk that he would attempt

21   suicide.  In reckless disregard of this known and obvious risk and/or as a result of

22   insufficient training and supervision, these Defendants failed to follow the written policies

23   of Defendants CITY AND COUNTY and HEALTHRIGHT360, which permit any

24   custodial or medical personnel to initiate protective placement upon receiving information

25   that alerts them to a potential suicide risk and requires that any "employee who observes

26   any signs of suicide or believes a prisoner may be at risk for suicide attempts, will notify

27   [Jail Psychiatric Services] immediately."

28       56.     Alberto Petrolino's deteriorated mental state while in custody in County Jail

[2998707-8]

No. 2 resulted from and was greatly exacerbated by Defendants' deliberately indifferent denial of psychiatric assessment and treatment and the grossly improper placement in a non-therapeutic general population jail environment, rather than inpatient hospitalization or, at minimum, specialized housing for persons at risk of suicide such as Observation Area Housing. From his booking into the County Jail on July 25, 2015 through his suicide on July 28, 2015, Albert was housed in an open cell in County Jail No. 2's Intake and Classification Pod that was inappropriate for a person in his unstable condition and in need of psychiatric care.

57.     On July 28, 2015, at some time between 6:30 pm and 7:30 pm, Alberto entered a shower stall in County Jail No. 2's Intake and Classification Pod. On or about 7:35 pm, an inmate named Miguel Ruiz went to the bathroom and noticed toes under the door to one of the shower stalls that were not touching the ground. Miguel Ruiz shouted out that something was wrong, and the Sheriff's Deputies on duty, including Defendants MOHN and ZAMORA and some of Defendant DOES 1 through 50, forced entry and found Alberto unresponsive. Defendants, as a result of their own deliberate indifference, negligence and/or inadequate training and supervision to render psychiatric and medical treatment to severely mentally disabled prisoners, failed to timely respond and provide life-saving treatment.

58.     Plaintiffs are informed and believe and thereon allege that Defendants failed to provide adequate staffing in County Jail No. 2's Intake and Classification Pod, and that the Sheriff's Deputies on duty, including Defendants MOHN and ZAMORA and some of Defendant DOES 1 through 50, failed to provide adequate supervision and checks to monitor Alberto's mental condition and safety. As a result, Alberto was able to remain unobserved in transit from his cell to the shower and to remain in the shower for a period of up to an hour when he was hanging from a cut bedsheet attached to a door hinge.

59.     Alberto was pronounced dead on the floor of County Jail No. 2's Intake and Classification Pod on July 28, 2015 at 8:15 pm. The San Francisco Medical Examiner later determined that the cause of death was suicide by hanging and that the hanging was

[2998707-8]

1 accomplished by means of a cut bedsheet.  This means of self-harm would not have been

2 available had Alberto been appropriately housed in a jail ward at S.F. General Hospital, an

3 Observation Cell, or in the Observation Area Housing.  Nor would Alberto have been left

4 unobserved on the way to and in the shower.

5        60.    As a direct and proximate result of the acts and/or omissions of Defendants

6 as set forth above, Alberto Petrolino suffered the following injuries and damages:

7             a.    Wrongful death, attributable to the deliberate indifference, negligence

8 and/or gross negligence of Defendants;

9             b.    Violation of his due process rights, including his right to be free from

10 cruel and unusual punishment, under the Fourteenth Amendment to the United States

11 Constitution;

12             c.    Violation of his right to be free from discrimination on account of his

13 mental disability in violation of Title II of the Americans with Disabilities Act and Section

14 504 of the Rehabilitation Act;

15             d.    Conscious, egregious and needless physical pain and suffering, mental

16 anguish, and severe emotional distress, pursuant to federal civil rights law;

17             e.    Violation of his right to life, the value of the loss of life, and the loss

18 of enjoyment of life; and

19             f.    Attorney's fees and expenses.

20        61.    As a direct and proximate result of the acts and/or omissions of Defendants,

21 Plaintiffs FABIO, M.P., ANDRELINA, ANGELA, and ALEX suffered the following

22 injuries and damages:

23             a.    Violation of their right to freedom of association under the First and

24 Fourteenth Amendments to the United States Constitution;

25             b.    Violation of their substantive due process right to be free from

26 unwarranted interference with the parent-child relationship under the Fourteenth

27 Amendment to the United States Constitution;

28             c.    Needless physical pain and suffering, emotional distress, hardship,

[2998707-8]

1  suffering, shock, worry, anxiety, sleeplessness, illness, trauma, suffering, and the loss of

2  the services, society, care, and protection of Alberto Petrolino;

3         d.     Loss of financial support and contributions, loss of the present value

4  of future services and contributions, and loss of economic security;

5         e.     Loss of society, companionship, comfort, and protection;

6         f.     Loss of care, attention, advice, and counsel;

7         g.     Emotional trauma and suffering, including fear, extreme emotional

8  distress, and horror;

9         h.     Burial and funeral expenses for Alberto Petrolino; and

10         i.     Attorney's fees and expenses.

11  **CLAIMS FOR RELIEF**

12  **FIRST CLAIM FOR RELIEF**

13  **Cruel and Unusual Punishment in Violation of the Fourteenth Amendment to the**
**Constitution of the United States**
14  **(Survival Action – 42 U.S.C. § 1983)**
**(Against Defendants EVE ZEFF, ROEL LAPITAN, RAPHROGER GONZAGA,**
15  **LAUREN ERICKSON, MARY LEFEVRE, NICK CRISPINO, MICHAEL MOHN,**
**RUDY ZAMORA, DANIEL MITCHELL, AND DOES 1 THROUGH 50)**

16

17       62.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 61 as

18  though fully set forth herein.

19       63.    Defendants knew that there was a strong likelihood that Alberto Petrolino

20  was in danger of serious personal harm and that he would try to harm himself, because:

21         a.     Defendants knew that Alberto Petrolino had been arrested while

22  intoxicated at the Golden Gate Bridge shortly after threatening to commit suicide there;

23         b.     Alberto Petrolino's family and ex-girlfriend had communicated to

24  Defendants their serious concerns that Alberto would follow through with his threats to

25  commit suicide and reported that he had attempted suicide in the past;

26         c.     Defendants observed that Alberto Petrolino exhibited danger signs of

27  suicidality, including intoxication at the time of arrest, daily alcohol consumption, and a

28  history of alcohol dependence;

1    d.    Defendants knew that Alberto Petrolino had a history of suicidal

2 ideation, including having been previously identified as a potential suicide risk at the San

3 Francisco County Jails, and having previously been involuntarily hospitalized at San

4 Francisco General Hospital, pursuant to California Welfare and Institutions Code § 5150,

5 after he had threatened to commit suicide by jumping off of the Golden Gate Bridge;

6    e.    Defendants declined to send Alberto Petrolino to San Francisco

7 General Hospital for psychiatric hospitalization or for evaluation and treatment by a mental

8 health professional;

9    f.    Defendants declined to place Alberto Petrolino on suicide watch or

10 house him in an Observation Cell where he would have been under "intensive

11 observation," including direct observation safety checks twice every 30 minutes and at

12 least daily evaluation by mental health professionals, and without access to materials that

13 could be used for self-harm;

14    g.    Defendants declined to house Alberto Petrolino in Observation Area

15 Housing where would have been housed in a cell with a glass door permitting ongoing

16 direct observation by custody and medical staff, with daily evaluations by mental health

17 professionals, and without access to materials that could be used for self-harm;

18    h.    Defendants decided that Alberto should be housed in general

19 population at the San Francisco County Jails, with no suicide prevention precautions other

20 than putting a "Do Not House Alone" code on his housing card, which they knew to be a

21 widely discredited response to suicidality that simply relies on the existence of a cellmate

22 to protect against self-harm by the person at risk of suicide;

23    i.    Defendants declined to provide Alberto Petrolino any mental health

24 treatment and did not ever provide him an evaluation by a doctor or psychiatrist;

25    j.    Defendants knew that Alberto Petrolino was attending a bail hearing

26 on July 27, 2015, a critical event requiring special attention by mental health staff, yet

27 decided to wait until two days after the hearing to check on his mental health status;

28    k.    Defendants knew that Alberto Petrolino was in such a devastated state

[2998707-8]

1  due to bad news he received at the bail hearing that his lawyer requested that the judge

2  order that Alberto Petrolino be involuntarily hospitalized for psychiatric evaluation and

3  treatment, yet they returned him to general population housing with no suicide precautions

4  at the San Francisco County Jails and declined to provide him with an evaluation or

5  assessment by mental health staff after the hearing;

6          l.      Defendants discontinued detoxification checks on Alberto Petrolino

7  by rote application of a 48-hour intake procedure despite the fact that he was still visibly

8  suffering withdrawal symptoms in court that same morning;

9          m.     Defendants observed Alberto Petrolino's deteriorating psychiatric

10  condition after the bail hearing, yet did not place him in an Observation Cell pending

11  assessment by mental health staff, summon immediate medical or mental health care, or

12  take any other suicide prevention measures;

13          n.      Defendants provided inadequate staffing, safety checks, supervision,

14  and monitoring to ensure Alberto Petrolino's safety and well-being in the general

15  population housing pod to which he was assigned; and

16          o.      Defendants declined to remove items from Alberto Petrolino's cell,

17  such as bedsheets, that could be used by him to commit suicide.

18       64.    Defendants failed to provide necessary medical and mental health evaluation

19  and treatment and adequate supervision for Alberto Petrolino while he was in the custody

20  of Defendant MITCHELL and while he was housed at the San Francisco County Jails,

21  despite his history of suicidal ideation, his high risk of harming himself, and his need for

22  inpatient psychiatric treatment.  Defendants acts and/or omissions as alleged herein,

23  including but not limited to their failure to provide Alberto Petrolino with appropriate

24  medical or psychiatric care and/or to take other measures to protect him from physical

25  harm and to prevent him from attempting suicide after receiving notice of his psychiatric

26  condition and high suicide risk, constituted deliberate indifference to Alberto Petrolino's

27  serious medical needs, health, and safety.

28       65.    To the extent that Defendants' acts or omissions as alleged herein were

[2998707-8]

1  undertaken in a supervisory capacity, including certain acts and/or omissions of some of

2  Defendant DOES 1 through 50, these Defendants knew and/or reasonably should have

3  known each fact alleged in paragraph 63, *supra*, and directed their subordinates in the acts

4  and/or omissions that resulted in the deliberately indifferent failure to protect Alberto

5  Petrolino, and/or set in motion the series of acts and/or omissions that they knew or

6  reasonably should have known would result in their subordinates' deliberately indifferent

7  failure to protect Alberto Petrolino, and/or failed to act to prevent their subordinates from

8  acts and/or omissions that they knew or reasonably should have known were occurring and

9  knew or reasonably should have known would constitute deliberate indifference to Alberto

10  Petrolino's safety.

11    66.    As a direct and proximate result of Defendants' above-described conduct,

12  Alberto Petrolino experienced physical pain, severe emotional distress, mental anguish, as

13  well as loss of his life and other damages alleged herein.

14    67.    The aforementioned acts and/or omissions of Defendants were willful,

15  wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive

16  damages to punish Defendants' wrongful conduct alleged herein and to deter such conduct

17  in the future.

18  ## SECOND CLAIM FOR RELIEF

19  **Municipal Liability for Violation of the Fourteenth Amendment to the Constitution
of the United States**

20  **(Survival Action - 42 U.S.C. § 1983)**
**(Against Defendants CITY AND COUNTY OF SAN FRANCISCO and**

21  **HEALTHRIGHT360)**

22    68.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 67 as

23  though fully set forth herein.

24    69.    Defendants acts and/or omissions as alleged herein, including but not limited

25  to their failure to provide Alberto Petrolino with appropriate medical or psychiatric care

26  and/or to take other measures to protect him from physical harm and to prevent him from

27  attempting suicide after notice of his psychiatric condition and high suicide risk, along

28  with the acts and/or omissions of the Defendants in failing to train, supervise, and/or

1  promulgate appropriate policies, customs, and/or practices to prevent Alberto Petrolino's

2  and other inmates' suicides, constituted deliberate indifference to Alberto Petrolino's

3  serious medical needs, health, and safety.

4      70.     The aforementioned acts and/or omissions of Defendants EVE ZEFF, ROEL

5  LAPITAN, RAPHROGER GONZAGA, LAUREN ERICKSON, MARY LEFEVRE,

6  NICK CRISPINO, MICHAEL MOHN, RUDY ZAMORA, and some or all of DOES 1

7  through 50, as well as the acts and/or omissions of other employees or agents of

8  Defendants CITY AND COUNTY and/or HEALTHRIGHT360, constituting deliberate

9  indifference to Alberto Petrolino's health and safety and violating Alberto Petrolino's civil

10 rights, were the direct and proximate result of policies and/or longstanding customs or

11 practices of Defendant CITY AND COUNTY and/or HEALTHRIGHT360.  Defendants

12 CITY AND COUNTY and HEALTHRIGHT360 have inadequate policies, customs, and

13 practices for suicide prevention, identifying inmates in need of immediate mental health

14 care and/or at risk of suicide, and for providing adequate mental health treatment, and fail

15 to appropriately train and supervise custody, medical, and mental health staff at the San

16 Francisco County Jails regarding these policies, customs, and practices.

17     71.     Defendants CITY AND COUNTY and HEALTHRIGHT360 knew and/or

18 reasonably should have known that the policies, customs, and practices described herein

19 were so obviously inadequate that they were likely to result in their agents and employees

20 causing inmates who require mental health treatment and who present a heightened risk of

21 suicide to suffer deprivations of their constitutional rights and, on information and belief,

22 Defendants CITY AND COUNTY and HEALTHRIGHT360 were further put on notice of

23 the dangerousness of their policies, customs, and practices because seven people had

24 previously committed suicide in the San Francisco County Jails since 2009.  The failure of

25 Defendants CITY AND COUNTY and HEALTHRIGHT360 to correct their policies,

26 customs, and practices, and their training and supervision, despite notice of these

27 significant and dangerous problems, constitutes deliberate indifference to the health and

28 safety of inmates such as Alberto Petrolino who require mental health treatment and who

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

[2998707-8]

1   present a heightened risk of suicide.

2       72.    The inadequate policies, customs, and/or practices of Defendants CITY

3   AND COUNTY and HEALTHRIGHT360 include but are not limited to an ongoing

4   pattern of deliberate indifference to the mental health needs and safety of San Francisco

5   County Jail inmates; the failure to conduct appropriate psychiatric assessments to identify

6   inmates with mental health needs and/or who pose a heightened suicide risk; the failure to

7   create and implement appropriate psychiatric treatment plans; the failure to promptly

8   evaluate and transfer to an appropriate psychiatric treatment facility San Francisco County

9   Jail inmates or newly arriving arrestees who are a potential danger to themselves; the

10   failure to take precautions to prevent suicide among high risk and mentally ill inmates,

11   including but not limited to placement on suicide watch, in Observation Cells, or in

12   Observation Area Housing; the reliance on the widely discredited policy of using a "Do

13   Not House Alone" code as a response to suicidality that simply relies on the existence of a

14   cellmate to protect against self-harm; the failure to provide mental health status evaluations

15   after a critical event, such as a court appearance where an inmate may receive bad news, to

16   assess the inmate's psychiatric stability and suicide risk; the application of a rote 48-hour

17   detoxification protocol without regard to current symptoms of inmates suffering from

18   alcohol withdrawal; and the failure to provide adequate staffing, security checks,

19   supervision, and monitoring in general population units in the San Francisco County Jails,

20   especially in units where inmates have unsupervised access to enclosed spaces such as

21   shower stalls and are not restricted access to materials that can be used for self-harm.

22       73.    Defendants CITY AND COUNTY and HEALTHRIGHT360 tacitly

23   encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and

24   knew that such conduct was unjustified and would result in violations of constitutional

25   rights by its agents and employees.

26       74.    The customs, policies, and practices of Defendants CITY AND COUNTY

27   and HEALTHRIGHT360 were a direct and proximate cause of Alberto Petrolino's injuries

28   and death in that Defendant CITY AND COUNTY and HEALTHRIGHT360 failed to

[2998707-8]

1  adequately train or supervise its agents and employees to prevent the occurrence of the

2  constitutional violations suffered by Alberto Petrolino and by other similarly-situated

3  inmates at the County Jail, as described herein, and failed to promulgate appropriate

4  policies or procedures or take other measures to prevent the constitutional violations

5  suffered by Alberto and by other similarly-situated County Jail inmates.

6         75.    As a direct and proximate result of Defendants' above-described conduct,

7  Alberto Petrolino experienced physical pain, severe emotional distress, mental anguish, as

8  well as loss of his life and other damages alleged herein.

9         76.    The aforementioned acts and/or omissions of Defendants were willful,

10  wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive

11  damages to punish Defendants' wrongful conduct alleged herein and to deter such conduct

12  in the future.

13  **THIRD CLAIM FOR RELIEF**

14  **Loss of Freedom of Association in Violation of the First and Fourteenth Amendments**
**to the Constitution of the United States**
15  **(42 U.S.C. § 1983)**
**(Against All Defendants)**
16

17         77.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 76 as

18  though fully set forth herein.

19         78.    The aforementioned acts and/or omissions of Defendants in being

20  deliberately indifferent to Alberto Petrolino's health and safety and violating his civil

21  rights and their failure to train, supervise, promulgate appropriate policies, customs, and/or

22  practices, and/or take other measures to prevent the conduct that caused the untimely and

23  wrongful death of Alberto Petrolino also deprived Plaintiffs FABIO, M.P., ANDRELINA,

24  ANGELA, and ALEX of their right to familial association as protected by the First

25  Amendment to the United States Constitution.

26         79.    The First Amendment protects certain intimate human relationships that

27  presuppose deep attachments and commitments to the necessarily few other individuals

28  with whom one shares not only a special community of thoughts, experiences, and beliefs

[2998707-8]

but also distinctively personal aspects of one's life.  Alberto Petrolino was one such individual for his son, FABIO, his daughter, M.P., his mother, ANDRELINA, his sister, ANGELA, and his brother, ALEX.

80.     As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, these Plaintiffs suffered injuries and damages as alleged herein, due to the death of Alberto Petrolino.

81.     The aforementioned acts and/or omissions of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages to punish Defendants' wrongful conduct alleged herein and to deter such conduct in the future.

## FOURTH CLAIM FOR RELIEF

**Loss of Parent-Child Relationship in Violation of Substantive Due Process Clause of the Fourteenth Amendments to the Constitution of the United States (42 U.S.C. § 1983) (Against All Defendants)**

82.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 81 as though fully set forth herein.

83.     The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Alberto Petrolino's health and safety and violating his civil rights and their failure to train, supervise, promulgate appropriate policies, customs, and/or practices, and/or take other measures to prevent the conduct that caused the untimely and wrongful death of Alberto Petrolino also deprived Plaintiffs FABIO, M.P., and ANDRELINA of their liberty interest in the parent-child relationship, in violation of their substantive due process rights as defined by the Fourteenth Amendment to the United States Constitution.

84.     As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, these Plaintiffs suffered injuries and damages as alleged herein, due to the death of Alberto Petrolino.

85.     The aforementioned acts and/or omissions of Defendants were willful,

[2998707-8]

1    wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive

2    damages to punish Defendants' wrongful conduct alleged herein and to deter such conduct

3    in the future.

4                              **FIFTH CLAIM FOR RELIEF**

5              **Violations of Title II of the Americans with Disabilities Act**
             **and Section 504 of the Rehabilitation Act of 1973**
6          **(Against Defendants CITY AND COUNTY OF SAN FRANCISCO and**
                              **HEALTHRIGHT360)**
7

8          86.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 85 as

9    though fully set forth herein.

10         87.     The conduct of Defendants, and of their officials, managers, agents and/or

11   employees, as alleged herein, violates Title II of the Americans with Disabilities Act

12   ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the federal regulations promulgated pursuant

13   thereto.  At all times relevant to this action, the ADA, 42 U.S.C. §§ 12101 *et seq.*, was in

14   full force and effect in the United States.

15         88.     Alberto Petrolino was a qualified individual with a disability, as that term is

16   defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 705(20), and as defined in

17   the ADA, 42 U.S.C. § 12131(2), as a person with a mental disability that substantially

18   limits one or more major life activities, including Alberto Petrolino's ability to care for

19   himself and avoid suicidal ideation and acts of self-harm.

20         89.     The ADA, 42 U.S.C. § 12132, prohibits public entities from discriminating

21   against a qualified individual with a disability in the provision of services, programs, or

22   activities.  Defendant CITY AND COUNTY is a public entity under Title II of the ADA.

23         90.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits any

24   program or activity receiving federal financial assistance from denying a qualified

25   individual with a disability the benefits of the program or activity or discriminating against

26   the qualified individual with a disability because of the disability.  Defendants CITY AND

27   COUNTY and HEALTHRIGHT360 receive federal financial assistance as that term is

28   used in 29 U.S.C. § 794.

[2998707-8]

91.     Alberto Petrolino was discriminated against in the provision of appropriate institutional placement and medical and/or mental health services by Defendants, and denied the benefits of the services, programs, and activities of Defendants CITY AND COUNTY and HEALTHRIGHT360 in the San Francisco County Jails because of his mental disability, in that he was not placed in a setting or provided appropriate services to reasonably accommodate his mental disability, and in that he was denied the service of a reasonably safe environment by the failure of Defendants and their agents and employees to take precautions to protect him from engaging in self-harm.

92.     The officials, managers, agents, and employees of Defendants CITY AND COUNTY and HEALTHRIGHT360 were engaged and acting within the scope of their employment when they engaged in the aforementioned acts and/or omissions that violated the ADA and the Rehabilitation Act, and thus Defendants CITY AND COUNTY and HEALTHRIGHT360 are liable for said conduct under the doctrine of respondeat superior and/or through ratification.  In addition, Defendant HEALTHRIGHT360 and its officials, managers, agents, and employees were engaged and acting pursuant to a contract with Defendant CITY AND COUNTY to provide mental health care services to inmates in the custody of the San Francisco County Jails, and thus Defendant CITY AND COUNTY is vicariously liable for said conduct under the ADA's implementing regulations.  *See* 28 C.F.R. § 35.130(b)(1).

93.     Defendants CITY AND COUNTY and HEALTHRIGHT360 had actual and/or constructive notice that the aforementioned acts and/or omissions, as alleged herein, would be substantially likely to result in violations of the ADA and the Rehabilitation Act, as the above-described reasonable accommodations were required by law and/or regulation, and the need for these reasonable accommodations was obvious, yet Defendants CITY AND COUNTY and HEALTHRIGHT360 deliberately failed to take action to prevent said substantially likely violations by their agents and employees.

94.     The aforementioned acts and/or omissions of Defendants, as alleged herein, were malicious, reckless, and/or accomplished with a wanton or conscious disregard of

[2998707-8]

1   Alberto Petrolino's rights.

2         95.    As a proximate result of said wrongful conduct by Defendants CITY AND

3   COUNTY and HEALTHRIGHT360, Alberto Petrolino suffered injuries and damages as

4   alleged herein.

5                        **SIXTH CLAIM FOR RELIEF**

6         **Violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 and 52**
    **(Against Defendants CITY AND COUNTY OF SAN FRANCISCO and**
7                              **HEALTHRIGHT360)**

8         96.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 95 as

9   though fully set forth herein.

10        97.    Alberto Petrolino was an individual protected under the Unruh Civil Rights

11  Act as a person with a mental disability.

12        98.    Alberto Petrolino was discriminated against in the provision of appropriate

13  institutional placement and medical and/or mental health services by Defendants, and

14  denied full and equal accommodations, advantages, facilities, privileges, or services of

15  Defendants CITY AND COUNTY and HEALTHRIGHT360 because of his mental

16  disability, in that he was not placed in a setting or provided appropriate services to

17  reasonably accommodate his mental disability, and in that he was denied the service of a

18  reasonably safe environment by the failure of Defendants and their agents and employees

19  to take precautions to protect him from engaging in self-harm.

20        99.    The conduct of Defendants CITY AND COUNTY and

21  HEALTHRIGHT360, by and through their departments, agencies, divisions, programs,

22  employees and/or agents, as alleged herein, violates the Unruh Civil Rights Act,

23  specifically including Cal. Civ. Code §§ 51(b) and 51(f).

24        100.   As a proximate result of Defendants' discrimination because of Alberto

25  Petrolino's mental disability and failure to provide full and equal accommodations to him,

26  Alberto Petrolino suffered injuries and damages as alleged herein.

27        101.   Plaintiffs are also entitled to recover a statutory civil penalty of twenty-five

28  thousand dollars ($25,000.00), as provided in Cal. Civ. Code § 52(b).

1

## SEVENTH CLAIM FOR RELIEF

2

### Professional Negligence/Medical Malpractice
(Survival Actions – Cal. State Law)
(Against Defendants CITY AND COUNTY OF SAN FRANCISCO, ZEFF,
LAPITAN, GONZAGA and some of DOES 3 through 50)

3

4

5       102.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 101 as

6   though fully set forth herein.

7       103.    At all relevant times herein, Defendants ZEFF, LAPITAN, and GONZAGA

8   were Registered Nurses licensed in the State of California and/or held themselves out to be

9   licensed nurses.  Plaintiffs are informed and believe and thereon allege that each of the

10  aforementioned Defendants, as well as some of Defendants DOES 3 through 50, were at

11  all relevant times herein "health care providers," as defined in California Civil Code §

12  3333.2.

13      104.    Defendants named herein, by virtue of their employment relationship with

14  Defendant CITY AND COUNTY, were at all relevant times herein immediately and

15  directly responsible for the availability and provision of medical and mental health care

16  services, including diagnosis and treatment, to all inmates in Defendant CITY AND

17  COUNTY's custody at the San Francisco County Jails and/or the jail wards at the San

18  Francisco General Hospital.  Accordingly, these Defendants were responsible for the

19  health and safety of inmates and the availability and provision of professional medical and

20  mental health treatment to inmates, including Alberto Petrolino.

21      105.    At all relevant times, Defendants named herein had a duty to render

22  reasonable professional medical and mental health care to Alberto Petrolino, to identify his

23  risk of suicidality, and to take reasonable protective measures to protect him from causing

24  harm to himself, consistent with the standards of reasonably competent health care

25  providers in similar circumstances.

26      106.    Defendants named herein negligently and/or recklessly failed to possess

27  and/or exercise that reasonable degree of knowledge and skill that is ordinarily possessed

28  and exercised by other health care providers in the same or similar locality and in similar

[2998707-8]

2998707-8

Case 3:16-cv-02946-RS   Document 1   Filed 06/02/16   Page 36 of 40

circumstances, in that, among other things:

       a.      Defendants failed to appropriately assess and/or evaluate Alberto Petrolino's mental health state and suicidality;

       b.      Defendants failed to recommend appropriate treatment, housing, and suicide prevention measures for Alberto Petrolino;

       c.      Defendants failed to summon medical or mental health care for Alberto Petrolino or to refer him to a doctor, psychiatrist, or other medical or mental health provider for assessment, evaluation, and/or treatment, despite having actual or constructive notice of Alberto's serious and obvious medical and mental health care needs;

       d.      Defendants failed to recommend that Alberto Petrolino be placed on suicide watch, in an Observation Cell, or in Observation Area Housing, where he would have been under close observation by custody staff, with daily evaluations by mental health professionals, and without access to materials that could be used for self-harm;

       e.      Defendants approved Alberto Petrolino's placement in general population housing with no suicide prevention precautions other than putting a "Do Not House Alone" code on his housing card, a widely discredited response to suicidality that simply relies on the existence of a cellmate to protect against self-harm;

       f.      Defendants failed to summon mental health staff to check on Alberto Petrolino's mental health condition after a court appearance where he was likely to receive bad news, a critical event requiring special attention by mental health staff to assess an inmate's suicide risk and psychiatric stability, despite his visibly deteriorating mental condition; and

       g.      Defendants discontinued detoxification checks on Alberto Petrolino by rote application of a 48-hour intake procedure despite the fact that he was still visibly suffering withdrawal symptoms in Court that same morning.

     107.   Any one of the above-described negligent and/or reckless actions or omissions falls below the duty of care consistent with the standards of reasonably competent health care providers in the field.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

108.    As a direct and proximate result of this negligence and/or recklessness, and failure to meet the professional standards of care, Alberto Petrolino suffered the injuries and damages as alleged herein.

109.    The conduct of the individual Defendants, as alleged herein, was committed within the course and scope of their employment with Defendant CITY AND COUNTY.

## EIGHTH CLAIM FOR RELIEF

**Failure to Furnish/Summon Medical Care**
**(Survival Action – Cal. Gov't Code § 845.6)**
**(Against Defendants CITY AND COUNTY OF SAN FRANCISCO, EVE ZEFF, ROEL LAPITAN, RAPHROGER GONZAGA, MICHAEL MOHN, RUDY ZAMORA, and some or all of DOES 1 through 50)**

110.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 109 as though fully set forth herein.

111.    Defendants owed Alberto Petrolino a duty of care to furnish him immediate medical and mental health care.

112.    The conduct of Defendants ZEFF, LAPITAN, GONZAGA, MOHN, ZAMORA, and of some or all of DOES 1 through 50, as alleged herein, including but not limited to the fact that each Defendant knew or had reason to know that Alberto Petrolino was in need of immediate medical and/or mental health care due to his obviously deteriorating mental state at the San Francisco County Jails and his heightened risk of suicide, and that each Defendant failed to take reasonable action to summon or provide that necessary medical and/or mental health care, resulting in Alberto Petrolino's death, violated California law, including California Government Code § 845.6.

113.    The conduct of the individual Defendants, as alleged herein, was committed within the course and scope of their employment with Defendant CITY AND COUNTY.

114.    As a direct and proximate result of Defendants' breach of their duty to furnish immediate medical and mental health care, Alberto Petrolino suffered injuries and damages causing great pain and leading to his death, as alleged herein.

115.    The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to

1   punish the wrongful conduct alleged herein and to deter such conduct in the future.  On

2   this cause of action, Plaintiffs seek exemplary and punitive damages against non-medical

3   Defendants only (*i.e.*, Defendants MOHN, ZAMORA and those among DOES 1 through

4   50 who are not health care providers).

5   **NINTH CLAIM FOR RELIEF**

6   **Wrongful Death**
    **(Cal. Code Civ. Proc. § 377.60)**

7   **(Against All Defendants)**

8       116.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 115 as

9   though fully set forth herein.

10       117.    At all times herein mentioned, all Defendants were subject to a duty of care

11   to avoid causing unnecessary physical harm and death to persons in their custody.  The

12   wrongful conduct of Defendants, as alleged herein, did not comply with the standard of

13   care to be exercised by reasonable persons and as such breached Defendants' duty, causing

14   Alberto Petrolino and Plaintiffs to suffer harm.

15       118.    Alberto Petrolino's death was a direct and proximate result of the

16   aforementioned wrongful and/or negligent acts and/or omissions of Defendants, as alleged

17   herein.  Defendants' acts and/or omissions thus were also a direct and proximate cause of

18   Plaintiffs' injuries and damages, as alleged herein.

19       119.    As a direct and proximate result of Defendants' wrongful and/or negligent

20   acts and/or omissions, Plaintiffs incurred expenses for funeral and burial expenses in an

21   amount to be proved.

22       120.    As a direct and proximate result of Defendants' wrongful and/or negligent

23   acts and/or omissions, Plaintiffs suffered injuries and damages as alleged herein, including

24   the loss of the services, society, care, and protection of Alberto Petrolino, and the loss of

25   the present value of his future services to his family.  Plaintiffs are further entitled to

26   recover prejudgment interest.

27       121.    The aforementioned acts of Defendants were willful, wanton, malicious, and

28   oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to

punish the wrongful conduct alleged herein and to deter such conduct in the future.  On this cause of action, Plaintiffs seek exemplary and punitive damages against non-medical Defendants only (*i.e.*, Defendants MITCHELL, MOHN, ZAMORA and those among DOES 1 through 50 who are not health care providers).

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for the following relief:

1.     For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.     For damages related to loss of familial relations as to Plaintiffs FABIO, M.P., ANDRELINA, ANGELA, and ALEX, including damages for loss of the services, society, companionship, comfort, care, attention, advice, counsel, and protection of the decedent;

3.     For general damages for decedent Alberto Petrolino's conscious, egregious, and needless physical pain and suffering, mental anguish, and emotional trauma and suffering, including fear, extreme emotional distress, and horror;

4.     For hedonic damages for the value of the loss of decedent Alberto Petrolino's life and the loss of enjoyment of life;

5.     For general damages including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness, trauma and suffering, loss of enjoyment of life, the loss of the services, society, care, and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

6.     For funeral and burial expenses and incidental expenses not yet ascertained;

7.     For prejudgment interest;

8.     For statutory treble damages pursuant to Cal. Civ. Code § 52(a);

9.     For a statutory civil penalty in the sum of $25,000, pursuant to Cal. Civ. Code § 52(b);

\\

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

1        10.     For punitive and exemplary damages against the appropriate Defendants, as

2   set forth herein, against said Defendants in an amount appropriate to adequately punish

3   Defendants and deter others from engaging in similar misconduct, in amounts according to

4   proof;

5        11.     For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42

6   U.S.C. § 12205, 29 U.S.C. § 794a, Cal. Civ. Code § 52(a), Cal. Code. Civ. Proc. § 1021.5,

7   and as otherwise authorized by statute or law; and

8        12.     For such other relief as the Court may deem proper.

9                             **DEMAND FOR JURY TRIAL**

10       Plaintiffs hereby demand trial by jury in this action.

11

12  DATED:  June 2, 2016              Respectfully submitted,

13                                   ROSEN BIEN GALVAN & GRUNFELD LLP

14

15                                   By:  */s/ Ernest Galvan*
                                          _____
16                                        Ernest Galvan

17                                   Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28