1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    FABIO PETROLINO, et al.,                Case No.  16-cv-02946-RS

          Plaintiffs,

8

          v.                                 **ORDER GRANTING DEFENDANT**
9                                            **MITCHELL'S SECOND MOTION TO**
     CITY AND COUNTY SAN FRANCISCO,          **DISMISS**
10   et al.,

11        Defendants.

12                          **I.  INTRODUCTION**

13        California Highway Patrol Officer Daniel Mitchell moves to dismiss claims brought

14   against him by the surviving family members of Alberto Petrolino ("plaintiffs"), who committed

15   suicide in jail three days after being arrested by Mitchell.  For the reasons that follow, Mitchell's

16   motion is granted.

17                          **II.  BACKGROUND**[1]

18        On July 25, 2015, Petrolino called his ex-girlfriend Debra from a payphone next to the

19   Golden Gate Bridge and left a voicemail threatening to kill himself.  After hearing the message,

20   Debra called 911 and reported that Petrolino had threatened to kill himself, and that she feared he

21   was going to jump off the bridge.  Mitchell responded to the call, and found Petrolino intoxicated

22   near the bridge.  Upon questioning by Mitchell, Petrolino became agitated, denied he was suicidal,

23   and denied calling Debra and threatening suicide.  He told Mitchell he had only called his sister

24   Angela, asking for a ride home.  Mitchell then called Debra, who confirmed Petrolino had left her

25   a message threatening suicide, and explained he had a history of threatening suicide.  Mitchell

26

27   _____

     [1] All factual allegations are drawn from plaintiffs' second amended complaint and taken as true for
28   the purpose of deciding this motion.  *See infra* Part III.

United States District Court
Northern District of California

1    discovered Petrolino had two outstanding misdemeanor bench warrants from 2015, and placed

2    him under arrest.  Mitchell then spoke on the phone with Angela, who communicated her belief

3    Petrolino was suicidal and in need of help.  She also explained to Mitchell that Petrolino had never

4    called her to ask for a ride.

5         Mitchell took Petrolino to San Francisco County Jail No. 1 for booking.  Upon arrival,

6    Mitchell made a "cursory" report to a sheriff's deputy, explaining "he had arrested [Petrolino] at

7    the Golden Gate Bridge following a 911 call warning that [Petrolino] was there to commit

8    suicide."  Second Am. Compl. ¶ 51.  Jail nurse Eve Zeff, who was responsible for screening

9    Petrolino, overheard the conversation and told Mitchell "if [Petrolino] was suicidal, he needed to

10   be cleared by psychiatric emergency services or brought to the hospital before being booked into

11   the County Jail."  *Id.* ¶ 52.  Instead, Mitchell "hastened his hand-off of [Petrolino] to the County

12   Jail by deliberately downplaying the . . . information he had received from [Debra and Angela]

13   about the high risk of suicide."  *Id.*  Mitchell "declined to warn San Francisco County Jail staff

14   that [Petrolino] posed a high risk of suicide, despite his knowledge of that risk, instead denying

15   that Alberto was suicidal and emphasizing [Petrolino's] self-report and his false statement that his

16   former girlfriend had only called 911 to get back at him."  *Id.* ¶ 72(i).  Although Mitchell's report

17   to jail staff was "incomplete and inaccurate," it "was still sufficient to make them aware of

18   [Petrolino's] known risk of suicide."  *Id.* ¶ 5.

19        Zeff conducted a medical triage of Petrolino with Mitchell present, and when she told

20   Petrolino "that if he was suicidal or was going to harm himself, he would be placed in a padded

21   cell, he became very agitated and emotional and denied that he was a danger to himself."  *Id.*

22   ¶ 53.  Despite Zeff's knowledge that Petrolino "presented a high risk of suicide due to his

23   intoxicated state at the time of his arrest, his known history of alcohol dependence, and his very

24   recent threat of suicide and possible aborted suicide attempt at the Golden Gate Bridge," she

25   accepted him into jail custody rather than sending him to the hospital.  That night, a jail nurse

26   performed a medical intake screening of Petrolino, and "an unlicensed Jail Psychiatric Services

27   mental health provider . . . conducted a mental health status evaluation."  *Id.* ¶ 55-56.  Although

28

1 these defendants were aware of Petrolino's suicide risk, they placed him in the jail's general

2 population.  Over the next two days, additional jail personnel were alerted to Petrolino's suicide

3 risk by his sister Angela and his mother Andrelina, and on July 27, Petrolino also met with a

4 psychiatric services social worker who reported Petrolino was focused on his upcoming bail

5 hearing.  At the hearing that day, Petrolino's bail was set at $100,000. The next day, Petrolino

6 committed suicide in the jail showers.

7 　　　As a result of Petrolino's suicide, plaintiffs commenced this suit, bringing a variety of

8 claims against multiple defendant parties.  Relevant to this motion, plaintiffs bring four claims

9 against Mitchell for allegedly failing to give jail personnel a complete or wholly accurate report

10 about Petrolino's risk of suicide.[2]  Plaintiffs bring three claims under 42 U.S.C. § 1983: cruel and

11 unusual punishment in violation of the Fourteenth Amendment; loss of freedom of association in

12 violation of the First and Fourteenth Amendments; and loss of parent-child relationship in

13 violation of the substantive Due Process Clause of the Fourteenth Amendment.  Plaintiffs also

14 bring a state law wrongful death claim under California Code of Civil Procedure section 377.60.

15 Mitchell previously moved to dismiss all four claims; his motion was granted as to the § 1983

16 claims, but denied as to the state law wrongful death claim.  Plaintiffs then filed a second amended

17 complaint, re-asserting all four claims, and Mitchell now moves again to dismiss plaintiffs' § 1983

18 claims, arguing qualified immunity shields him from liability.

19 **III.  LEGAL STANDARD**

20 　　　"A pleading that states a claim for relief must contain . . . a short and plain statement of the

21 claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  "[D]etailed

22 factual allegations are not required," but a complaint must provide sufficient factual allegations to

23

_____

24 [2] Plaintiffs' claims are also based on Mitchell's choice to take Petrolino to jail rather than to a
hospital.  This was the sole theory of liability advanced in plaintiffs' first amended complaint, and
25 plaintiffs' § 1983 claims in the first amended complaint were all dismissed because qualified
immunity protects Mitchell from any § 1983 liability based on this theory.  Plaintiffs' second
26 amended complaint presents no new facts that would invite a contrary legal conclusion.  Thus, to
the extent they are based on Mitchell's choice to take Petrolino to jail rather than to a hospital,
27 plaintiffs' § 1983 claims are again dismissed.

28

United States District Court
Northern District of California

"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). Federal Rule of Civil Procedure

12(b)(6) provides a mechanism to test the legal sufficiency of the averments in a complaint.

Dismissal is appropriate when the complaint "fail[s] to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6). A complaint in whole or in part is subject to dismissal if it

lacks a cognizable legal theory or the complaint does not include sufficient facts to support a

plausible claim under a cognizable legal theory. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

2001). When evaluating a complaint, the court must accept all its material allegations as true and

construe them in the light most favorable to the non-moving party. *Iqbal*, 556 U.S. at 678.

## IV.  DISCUSSION

Mitchell argues all three of plaintiffs' § 1983 claims fail because he is protected by

qualified immunity.[3] The doctrine of qualified immunity protects government officials "from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457

U.S. 880, 818 (1982); *see also Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (qualified immunity

is "an immunity from suit rather than a mere defense to liability"). In *Saucier v. Katz*, the

Supreme Court established a sequential two-step approach for resolving government officials'

qualified immunity claims, whereby a court must decide: (1) whether, viewing the facts in the

___

[3] Mitchell also argues plaintiffs' § 1983 claims should be dismissed because plaintiffs cannot show Mitchell's allegedly incomplete and misleading warning proximately caused Petrolino to die by suicide. "The causation requirement of sections 1983 and 1985 is not satisfied by a showing of mere causation in fact . . . . Rather, the plaintiff must establish proximate or legal causation." *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citations omitted). The standard for proximate cause in a 1983 action essentially corresponds to the "the standard 'foreseeability' formulation of proximate cause" in tort law. *Id.* (citation omitted). Plaintiffs, however, have adequately alleged proximate cause because it is foreseeable that inadequate warnings of suicide risk could result in an inmate's death by suicide. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1080-81 (9th Cir. 2013) ("[P]laintiffs who have already demonstrated a triable issue of fact as to whether prison officials exposed them to a substantial risk of harm, and who actually suffered precisely the type of harm that was foreseen, will also typically be able to demonstrate a triable issue of fact as to causation.").

1    light most favorable to plaintiff, the government actors violated plaintiff's constitutional rights;

2    and (2) whether these constitutional rights were clearly established at the time of the violation.

3    533 U.S. 194, 201 (2001).  In *Pearson v. Callahan*, the Court refashioned this sequential two-step

4    process, and held that "judges of the district courts and the courts of appeals should be permitted

5    to exercise their sound discretion in deciding which of the two prongs of the qualified immunity

6    analysis should be addressed first in light of the circumstances in the particular case at hand."  555

7    U.S. 223, 236 (2009).

8         With regards to the second prong of the inquiry, "clearly established law [is not to be

9    defined] at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  In deciding

10   whether a constitutional right was clearly established at the time of the alleged violation, a court

11   must ask "whether the violative nature *of particular conduct* is clearly established."  *Id.* (emphasis

12   added).  "This inquiry, it is vital to note, must be undertaken *in light of the specific context of the*

13   *case*, not as a broad general proposition . . . ."  *Saucier*, 533 U.S. at 201 (emphasis added).  To be

14   clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official

15   would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635,

16   640 (1987).  A case directly on point is not required, "but existing precedent must have placed the

17   statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.

18        The parties agree plaintiffs's § 1983 claims all allege "deliberate indifference."  *See*

19   *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010) (citations omitted) ("We

20   have long analyzed claims that correction facility officials violated pretrial detainees'

21   constitutional rights by failing to address their medical needs (including suicide prevention) under

22   a 'deliberate indifference' standard."), *overruled on other grounds by Castro v. Cty. of Los*

23   *Angeles*, No. 12-56829, 2016 WL 4268955 (9th Cir. Aug. 15, 2016) (en banc).  There are two

24   separate deliberate indifference standards: subjective, which asks whether the defendant

25   consciously disregarded an "excessive risk" and objective, which asks whether the defendant

26   recklessly disregarded that risk.  *See Castro*, 2016 WL 4268955 at *7, *7 n.4.  It is not clear in this

27   case, however, whether the subjective or objective standard of deliberate indifference should

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    apply.  *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015) (applying an objective standard

2    to the question of whether an officer committed excessive force against a pretrial detainee);

3    *Castro*, 2016 WL 4268955, at *6 ("*Kingsley*'s holding . . . does not necessarily answer the broader

4    question whether the objective standard applies to all § 1983 claims brought under the Fourteenth

5    Amendment against individual defendants."); *Clouthier*, 591 F.3d at 1243 (citations omitted)

6    (applying the subjective deliberate indifference standard in the context of a jail suicide).  For the

7    purpose of deciding this motion, it is not necessary to choose which standard applies, because

8    Mitchell is entitled to qualified immunity even under the more plaintiff-friendly objective

9    standard.  *See Castro*, 2016 WL 4268955 at *7 ("Thus, the test to be applied under *Kingsley* must

10   require a pretrial detainee who asserts a due process claim for failure to protect to prove more than

11   negligence but less than subjective intent — something akin to reckless disregard.").

12          Plaintiffs sufficiently show the existence of a detainee's general Fourteenth Amendment

13   right to be free from deliberate indifference as a "broad general proposition."[4]  *Saucier*, 533 U.S.

14   at 201, *see Clouthier*, 591 F.3d at 1244-45 (denying qualified immunity for a Fourteenth

15   Amendment claim premised on alleged deliberate indifference to a detainee's heightened risk of

16   suicide); *Conn v. City of Reno*, 591 F.3d 1081, 1090 (9th Cir. 2010) (denying summary judgment

17   and qualified immunity to officers who witnessed an arrestee attempt suicide but "failed to report

18   the incident to jail personnel or take [the arrestee] to a hospital"), *cert. granted, judgment vacated*

19   *sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *op'n reinstate in relevant part*, 658

20   F.3d 897 (9th Cir. 2011).  They fail, however, to show the rights they invoke were clearly

21   established in "the specific context of [this] case," *Saucier*, 533 U.S. at 201 — that a reasonable

22   official would have understood Mitchell's communications with jail personnel violated those

23   rights, *Anderson*, 483 U.S. at 640.

---

24   [4] Plaintiffs' First Amendment familial association claim fails at the outset for the same reasons

25   identified in the order granting Mitchell's first motion to dismiss.  Mitchell points out, and
     plaintiffs acknowledge, that the order concluded plaintiffs failed to establish the existence of a

26   detainee's First Amendment associational rights to be free from deliberate indifference.
     Accordingly, this legal conclusion endures, and provides a basis for dismissal of the claim in

27   addition to the other basis laid out herein.

28

United States District Court
Northern District of California

1     The authorities plaintiffs identify make clear a detainee's Fourteenth Amendment rights

2  require jail personnel be alerted of that detainee's risk of suicide.  *See Conn*, 591 F.3d at 1102

3  ("When a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting

4  officers must report the incident to those who will next be responsible for her custody and safety.

5  Thus, the constitutional right at issue here has been clearly established."); *see also Cavalieri v.*

6  *Shepard*, 321 F.3d 616, 622-24 (7th Cir. 2003) (denying qualified immunity to a police officer

7  who failed to report to jail personnel a detainee's risk of suicide).  These authorities do not,

8  however, indicate the right encompasses anything more because they do not place requirements on

9  the contents of that alert other than that it place jail personnel on notice of the suicide risk.[5]  *See*

10  *Cavalieri v. Shepard*, 321 F.3d at 623 (citation omitted) ("The question is what [the defendant]

11  was supposed to do in the face of the knowledge of a life-threatening situation . . . . He made

12  several telephone calls to the [jail], but he passed by the opportunity to mention . . . [the detainee]

13  was a suicide risk . . . . If [the defendant] had known that a detainee had an illness that required

14  life-saving medication, he would also have had a duty to inform the [jail], or any other entity that

15  next held custody over the detainee."); *Conn*, 591 F.3d at 1102; *Gordon v. Kidd*, 971 F.2d 1087,

16  1095 (4th Cir. 1992), *as amended* (July 7, 1992) (granting qualified immunity to a booking officer

17  who, when passing off a detainee to jail personnel, said "He may try to hang himself.  Here is his

18  belt.").  Put another way, a transporting officer's warning of a suicide risk demarcates the extent of

19  a detainee's clearly established right in this context, and a reasonable officer in Mitchell's position

20  would not have understood himself to be violating that right given that he put jail personnel on

21  notice of such risk.  *See* Second Am. Compl. ¶ 5 ("Jail staff received information from Officer

22  Mitchell that while incomplete and inaccurate was still sufficient to make them aware of Alberto's

23  known risk of suicide.").

24  _____

25  [5] The other authorities plaintiffs identify concern custodial jail staff or officers, as opposed to
officers who, like Mitchell, delivered the detainee to jail custody.  *See Penn v. Escorsio*, 764 F.3d

26  102 (1st Cir. 2014); *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984 (7th Cir. 2012).
Thus they are not readily applicable to the "the specific context of the case."  *Saucier*, 533 U.S. at

27  201.

28

United States District Court
Northern District of California

1    It is possible, of course, that a transporting officer's warning to jail staff will be so

2  misleading or inadequate as to negate entirely the staff's notice of an inmate's suicide risk.

3  Likewise, a transporting officer may totally undercut the effect of a suicide warning by

4  contradicting it with material misrepresentations about the inmate's risk of suicide.  In these

5  instances, the transporting officer will not have discharged his duty of reporting the inmate's risk

6  of suicide, because he will have put the jail staff in the same position as if they were never warned

7  at all.  This seems to be the thrust of plaintiffs' argument, that Mitchell so mislead jail staff

8  through omissions and misrepresentations that he effectively erased their notice of Petrolino's risk

9  of suicide.  Their complaint, however, identifies no statements of Mitchell's having such an effect,

10  and the complaint clearly implies Mitchell *did not* negate his own warning, because it alleges jail

11  staff recognized Petrolino's suicide risk when they accepted him into jail custody.  *See, e.g.*, *id.*

12  ¶ 54 ("Despite Defendant ZEFF's knowledge that [Petrolino] presented a high risk of suicide due

13  to . . . his very recent threat of suicide and possible aborted suicide attempt at the Golden Gate

14  Bridge, she accepted [him] into custody . . . .").  At most, the operative complaint avers that

15  Mitchell elected to emphasize certain information that cast doubt on an actual suicide risk, *see id.*

16  ¶ 72(i), but that did not nullify the jail staff's notice of that risk, *see id.* ¶ 5.  Thus, Mitchell is

17  entitled to qualified immunity and plaintiffs' § 1983 claims against him are dismissed.

## V.  CONCLUSION

19    Mitchell's second motion to dismiss is granted, and plaintiffs' § 1983 claims are dismissed

20  without further leave to amend.

22  **IT IS SO ORDERED**.

24  Dated: January 6, 2017

26  RICHARD SEEBORG
   United States District Judge